IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON


ZAVAKOS ENTERPRISES, INC.,      :

               Plaintiff,

       -vs-

ST. PAUL SURPLUS LINES
INS. CO.,

           Defendant.        :

Case No. 3:04-cv-381

Chief Magistrate Judge Michael R. Merz

## DECISION AND ORDER

This matter is before the Court on Plaintiff Zavakos Enterprises, Inc.'s (Zavakos Enterprises) Motion for Partial Summary Judgment, (Doc. 24), and on Defendant St. Paul Surplus Lines Ins. Co.'s (St. Paul) Motion for Summary Judgment. (Doc. 26). The parties have fully briefed the issues, (Docs. 24, 27, 29; 26, 28), and the matters are ripe for decision on the merits.

The parties have consented to plenary magistrate judge jurisdiction pursuant to 28 U.S.C. §636(c) and the matter has been referred on that basis. (Doc. 8).

Zavakos brought this action against St. Paul in the Montgomery County Common Pleas Court, Case No. 2004-cv-6303 (filed Sept. 17, 2004) alleging bad faith breach of an insurance contract. (Doc. 1 and Attachment "A" thereto). St. Paul removed the action to this Court on the basis of the Court's diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1). *Id.* Subsequently, the parties filed the present Motions.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157-59 (1970).  Nevertheless, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;  the requirement is that there be no *genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).  Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a Rule 50 motion for judgment as a matter of law.  *See, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir. 1989).  If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate.  *Id.*  The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The moving party

[A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the

2

> pleadings, depositions, answers to interrogatories, and admissions on
> file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation

omitted).  In ruling on a motion for summary judgment (in other words, determining whether there

is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search

the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal*

*Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990).  Thus,

in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled

to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories,

and admissions on file, together with any affidavits submitted, specifically called to its attention by

the parties.

With these principles in mind, and for purposes of the present Motions, the facts of

this case are as follows.

At all times relevant to this action, Mr. Christ Zavakos was president and owner of

Zavakos Enterprises.  Affidavit of Christ Zavakos, Aug. 26, 2005 (Doc. 24, Attach. 1 thereto).

Zavakos Enterprises, in turn, owned property, including the structure located at 50 Foley Drive,

Vandalia, Ohio. *Id.*  St. Paul insured the property. *Id.*  Gary Hunter was leasing the property from

Zavakos Enterprises and had an agreement with Zavakos Enterprises to purchase the property.

Affidavit of Gary Hunter, Aug. 25, 2005 (Doc. 26, Attach. 1 thereto).  Mr. Hunter was operating a

bowling alley known as Planet Bowl at the Foley Drive property[1]. *Id.*

---

[1] Zavakos Enterprises had previously operated a bowling alley known as Crossroads Lanes at the Foley
Drive location.

3

On Friday, June 27, 2003, Mr. Hunter noticed that the ceiling in Planet Bowl was sagging.  Hunter Affidavit.  Mr. Hunter called Mr. Zavakos to tell him about the situation.  *Id.*  Mr. Hunter also notified  St. Paul.  *Id.*  Mr. Zavakos went to the Foley Avenue premises and observed that a small portion of the ceiling at Planet Bowl was out of place and that one of the roof cords appeared to be cracked.  Zavakos Affidavit.  However, Mr. Zavakos did not appreciate the significance of what he had observed.  *Id.*  Mr. Zavakos left Planet Bowl but returned later in the day and met with an adjuster whom he is unable to identify.  *Id.*  Dennis Gilday has testified that he was the adjuster with whom Mr. Zavakos met on June 27, 2003.  Deposition of Dennis Gilday, July 25, 2005 (Doc. 23).  Mr. Zavakos had no idea that the building was unstable.  Zavakos Affidavit.

At the time Mr. Zavakos met with Mr. Gilday, he informed Mr. Gilday that he had a contractor coming to the premises probably the next day on an unrelated matter and that he (Mr. Zavakos) would ask the contractor to take a look at the situation.  *Id.*  Mr. Gilday advised Mr. Zavakos that St. Paul would have a structural engineer come to assess the situation.  *Id.*  At that point, Mr. Zavakos assumed that he would be advised of the results of the engineer's assessment as well as what needed to be done.  *Id.*  However, Mr. Zavakos heard nothing further until July 2, 2003.  *Id.*  The contractor whom Mr. Zavakos was expecting to come to the premises on Saturday, June 28, 2003, did not come.  *Id.*  Mr. Zavakos attempted to contact the contractor on Monday, June 30, 2003, but was unsuccessful in doing so.  *Id.*

The next time Mr. Zavakos was at the Foley Drive property was in the early afternoon on Wednesday, July 2, 2003.  Examination Under Oath of Christ Zavakos, p. 30-31, May

4

27, 2004 (Doc. 25)[2]. At that time, Mr. Zavakos noted that there was a crack in and some settlement of the ceiling on the north end of the building. *Id.* at 34. Mr. Zavakos left the property and went to have an early dinner. *Id.* at 33. While eating dinner, Mr. Zavakos received a telephone call from the police advising him to return to the property right away because a wall of the structure had given away. *Id.* After finishing his dinner, Mr. Zavakos returned to the Foley Drive property and saw that the north wall of the structure was lying in the parking lot. *Id.* at 34. Mr. Zavakos also saw that while the roof which was supported by the south wall was intact, that the roof that had been supported by the north wall was lying on an angle and part of it had come down onto the bowling lanes inside the building. *Id.*

Subsequently, Zavakos Enterprises filed a Proof of Loss with St. Paul in the amount of $1,130,000.00 which it alleges is equal to the damages the property and structure sustained as a result of the July 2, 2003, incident. (Doc. 1, Attachment 1 thereto). St. Paul has refused Zavakos Enterprises' demand for coverage and payment under the policy. *Id.* Zavakos then filed this action. *Id.*

The policy which St. Paul issued to Zavakos Enterprises reads in part:

**WHAT TO DO IF YOU HAVE A LOSS**

You or other protected persons are required to perform the duties described below when a property loss that may be covered under this policy happens or an accident or incident happens that could result in liability damages coverage under this Policy. Failure to comply could affect coverage. The insuring agreements contained in this

---

[2] It is doubtful, at best, as to whether an Examination Under Oath (EUO) is proper Rule 56 evidence. Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the *pleadings, depositions, answers to interrogatories,* and *admissions on file,* together with the *affidavits,* if any, show that thee is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.")(emphasis supplied). However, at this juncture, the Court cites to Mr. Zavakos' EUO for purposes of background information only—information that is not in dispute.

policy determine what is covered. As a result, you should read them carefully to understand the extent of the coverage provided.

**When This Policy Provides Property Protection**

If there is a property loss that may be covered by property protection provided in this policy you must:
...
**3.** Do what is reasonable and necessary to protect covered property from further damage. Keep a record of your expenses for consideration in your claim.

**4.** If feasible, separate the damaged property from the undamaged and make an inventory of the damaged items.

**5.** Cooperate with us in the investigation and settlement of this claim. Permit us to inspect the damaged property and any records pertaining to your loss as many times as may be required. Permit us to take samples of damaged and undamaged property for testing and analysis.

**6.** Allow us to examine you or any other insured under oath while not in the presence of any other insured. We may do this whenever reasonably required about any matter relating to this insurance or the claim. Any insured we examine must sign a copy of their answers.

**7.** Send us a signed, sworn proof of loss containing the information we need to resolve the claim. You must do this within 60 days after our request. We'll supply the forms. We'll pay within 30 days after we reach agreement with you.
...

**What This Agreement Covers**

The description of property covered, the limit of coverage, and other applicable terms and conditions are shown in the Coverage Summary.

**Covered Causes Of Loss**

We'll protect covered property against risks of direct physical loss or damage except as indicated in the Exclusions - Losses We Won't Cover section.

**Property Covered**

6

In the following sections, we explain what is included under the building and business personal property coverages. The Coverage Summary will indicate which coverages you have purchased under this policy.

**Building Coverage**

We'll cover your financial interest in the covered building or structure. While at the same location, we'll also cover:

– machinery and equipment that are a permanent part of a covered building and are used to provide building services such as elevators and heating equipment.
– fixtures or yard fixtures such as lampposts and flagpoles.
– property which you own and use to service or maintain a covered building or structure or its premises. But your building coverage doesn't apply to property that you, as a landlord, use to furnish apartments or rooms in your covered building.

...

**Business Personal Property Coverage**

We'll cover your business personal property while:

– in or on a building described in the Coverage Summary.

...

*Business personal property* means things you own or have a financial interest in such as stock, furniture, fixtures, machinery, equipment, computer hardware, software, data prototypes, supplies, and other movable items and all other personal property owned by you and used in your business.

...

*Covered location* means any of the following:

– locations scheduled or described in the Coverage Summary;

...

**Exclusions – Losses We Won't Cover**

7

When we use the word "loss" in this section, we also mean damage.

...

**Acts or Decisions**

We won't cover loss caused by or resulting from any act or decision or by the failure to act or decide, of any person, group, organization, or unit of government.  If a loss not otherwise excluded results, we'll pay for that resulting loss.

...

**Collapse**.  We won't cover loss caused by or resulting from collapse unless due to any of the following causes of loss:

– fire, smoke, lightning, wind, hail, explosion, vehicles, aircraft, vandalism, malicious mischief, civil disturbance, riot, leakage from fire extinguishing equipment, sinkhole collapse, and volcanic action; building glass breakage, falling objects, weight of ice, snow, or sleet, water damage;
– decay that is hidden from view, unless he presence of such decay is known or should have been known to an insured prior to collapse;
– insect or vermin damage that is hidden from view, unless the presence of such damage is known or should have been known to an insured prior to collapse;
– weight of people or business personal property or other personal property;
– weight of rain which collects on a roof; or
–use of defective material or methods in construction, remodeling, or renovation if the collapse occurs before such is completed.

*Collapse* means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.  A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.  A part of a building or any part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.  A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

...

**Indirect loss.** We won't cover loss caused by or resulting from:

– delay;

...

## MOLD OR BACTERIA EXCLUSION ENDORSEMENT WITH LIMITED ADDITIONAL COVERAGE

This endorsement changes your Property Protection insuring agreement. It applies to all locations unless otherwise specified in the Coverage Summary.

### How Coverage Is Changed

There are four changes which are explained below. These changes limit coverage.

**1.** The Wear, tear, deterioration, animals exclusion is replaced by the following:

**Wear, tear, deterioration, animals.** We won't cover loss caused by or resulting from:

– wear and tear;
– deterioration, rust, or any other corrosion;
– shrinkage, evaporation, loss of weight;
– changes in flavor, color, texture, or finish;
– nesting or infestation or discharge or release of waste products or secretions, by insects, birds, rodents, or other animals;
– the inherent nature of the property.

*Inherent nature* means a latent defect of any quality in the property that causes it to deteriorate or destroy itself.

If a loss from fire, smoke, lightning, wind, hail, explosion, vehicles, aircraft, vandalism, malicious mischief, civil disturbance, riot, leakage from fire extinguishing equipment, sinkhole collapse, volcanic action, building glass breakage, falling objects, weight of ice, snow, or sleet or water damage results, we'll pay for that resulting loss.

9

> *Water damage* means the accidental discharge of leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system of appliance, other than a sump system, containing water or steam.

(Doc. 26, Ex. 7 attached thereto).

In a diversity action involving an insurance contract, a federal court applies the law of the forum state as set forth by the state's highest court. *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938); *Talley v. State Farm Fire and Casualty Co.,* 223 F.3d 323, 326 (6th Cir. 2000). In Ohio, normal rules of contract construction apply to the interpretation of insurance policies. *St. Marys Foundry v. Employers Ins. of Wausau*, 332 F.3d 989, 992 (6th Cir. 2203)(citation omitted) (applying Ohio law). Ohio courts first determine whether contract terms are ambiguous. *Id.* (citation omitted). A term is ambiguous if it is reasonably susceptible of more than one meaning. *Id.* (citation omitted). If the terms of the contract are unambiguous, the court determines the meaning of the contract. *Id.* (citation omitted). Ohio courts give the terms of the contract their plain and natural meaning. *Id.* (citation omitted).

An insurance contract prepared by the insurer must be construed liberally in favor of the insured and strictly against the insurer if the language is doubtful. *American Financial Corp. v. Fireman's Fund Ins. Co.*, 15 Ohio St.2d 171 (1968). When an insurance policy includes ambiguous exclusions, a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof. *St. Marys,* 332 F.3d at 992 (citation omitted). Courts should not construe an insurance contract against the insurer in the absence of ambiguity in its language. *Id.* at 993.

In determining the plain meaning of an insurance contract, the contract should be read as a whole and each word given its appropriate meaning, if possible. *Hartzel Industries, Inc. v.*

10

*Federal Ins. Co.*, 168 F.Supp.2d 789, 793 (S.D.Ohio 2001)(Rice, C.J.)(citations omitted). Where a policy is ambiguous, it is to be liberally construed in favor of the insured. *Id.* (citations omitted). This rule of construction, however, is not applicable if the language is clear, if applying it would provide an unreasonable or forced interpretation, or if it would result in an extension of coverage. *Id.* (citations omitted).

The Court first notes that the parties agree that the initial June 27, 2003, incident was not covered under the Policy as a "collapse". *See* Doc. 24 at 8; Doc. 26 at 15. The issue, then, is whether the July 2, 2003, incident and resulting damages were covered under the Policy.

As noted above, the Policy provides that "when a property loss that may be covered under this policy happens or an accident or incident happens that could result in liability damages coverage under this Policy" the insured must do what is reasonable and necessary to protect the covered property from further damage.

This Court concludes that there are genuine issues of material fact as to whether Mr. Zavakos complied with the requirements contained in the Policy and therefore whether the July 2, 2003, incident was a covered event.

In support of its Motion that the Policy did not provide coverage for the July 2, 2003, collapse, St. Paul relies in great part on Mr. Zavakos' May 27, 2004, EUO. As this Court noted *supra.* at n.2, it is doubtful, at best, that an EUO is proper Rule 56 evidence.

The purpose of an examination under oath is to obtain information as part of the insurer's investigation of the insured's claim rather than for litigation. *Sarkisyants v. State Farm Mutual Automobile Ins. Co.,* No. C04-03299, 2005 WL 3097735 *3 (N.D.Ca. Nov. 14, 2005)(citation omitted). The procedures are also different particularly because an examination under

11

oath is not subject to the rules of procedure or evidence and the insured's counsel has no right to examine the insured. *Cf., Id.* Also, unlike a deposition, in an examination under oath, the insured is obligated to volunteer relevant information. *Id.*

With these principles in mind, this Court concludes that an EUO does not provide the same degree of reliability that a deposition provides when a matter is before the Court on summary judgment.[3] It might be argued that the same analysis would apply to testimony provided in an affidavit, that is, that affidavit testimony is less reliable than deposition testimony. However, Rule 56(c) specifically allows for affidavit testimony in support of, or in opposition to, a motion for summary judgment. In addition, it has long been the law that if a party has been examined at length at a deposition, he or she may not create an issue of fact for purposes of defeating a summary judgment motion by providing an affidavit which contradicts the earlier deposition testimony. *See Reid v. Sears Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir. 1986)(citation omitted); *see also, Dotson v. U.S. Postal Service,* 977 F.2d 976 (6th Cir.), *cert. denied,* 506 U.S. 892 (1992).

There is testimony from Mr. Hunter and Mr. Gilday indicating that Mr. Zavakos was essentially aware of the impending collapse, that prior to the collapse he inspected the area involved in the collapse, that he was advised of the seriousness of the situation following the June 27, 2003 incident, that prior to the collapse he advised people to vacate the building and to stay out of the building until the situation was at least evaluated, and that he knew people who could take care of the situation and would have them do so before June 30, 2003. However, Mr. Zavakos' affidavit testimony contradicts that evidence. At this stage of the litigation, the contradictory testimony is sufficient to create a genuine issue of material fact as to whether Mr. Zavakos knew or should have

---

[3]At this point in the litigation, the Court expresses no opinion as to any other potential uses for an EUO.

known of the impending collapse and, if so, whether he violated the terms of the Policy by failing

to act to protect the premises or prevent damage to the premises.

For the foregoing reasons, the motions for summary judgment (Doc. Nos. 24 & 26)

are denied.  The Court's Judicial Assistant, DeAnna Perry, will contact counsel to set the case for

trial.

January 12, 2006.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

J:\Zavakos_MSJ.wpd